# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>KIMBERLY ANN GILLASPIE,<br><br>     Debtor. | Case No. 09-1536<br>Chapter 7 |
| FIDELITY NATIONAL TITLE AND ESCROW COMPANY OF HAWAII, INC.,<br><br>     Plaintiff,<br><br>  vs.<br><br>KIMBERLY ANN GILLASPIE,<br><br>     Defendant. | Adv. Pro. No. 09-90062<br><br><br><br><br><br>Re: Docket No. 1 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

The trial in this adversary proceeding was held on September 21-24, 2010.

Elizabeth Kane represented plaintiff Fidelity National Title and Escrow Company

of Hawaii, Inc. ("Fidelity"), and Dana Lyons and Ted Pettit represented defendant

---

[1]The court has not selected this decision for publication.

Kimberly Ann Gillaspie. Based on the evidence, the court makes the following

**FINDINGS OF FACT:**

1.      Fidelity is a licensed escrow depository doing business in Hawaii.

2.      In 2002, Fidelity hired Ms. Gillaspie as an assistant vice president and branch manager of its Kona office. As branch manager, Ms. Gillaspie supervised the employees and operations of the Kona office and also acted as an escrow officer.

3.      An escrow depository such as Fidelity accepts money and documents from one or more parties and then distributes the money and documents in accordance with the parties' instructions. Fidelity also records real estate documents in the appropriate offices and offers title insurance.

4.      Fidelity entrusts its branch managers and escrow officers with the duty to carry out Fidelity's obligations to hold client funds and documents, to distribute and record them as instructed, and to deal honestly and fairly with its customers. Fidelity reasonably relied upon Ms. Gillaspie to carry out these duties.

5.      As a matter of corporate policy, Fidelity gave substantial autonomy and responsibility to its branch managers and escrow officers to serve its customers and solve their problems.

6.      At some point, Fidelity learned that Ms. Gillaspie owned Pueo Real

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed  10/08/10   Page 2 of 25

Estate Services Unlimited LLC ("Pueo"), an entity whose business overlapped with that of Fidelity. In 2008, Fidelity learned that Ms. Gillaspie was working on Pueo's business while on the job at Fidelity's office. At about the same time, Fidelity learned that Ms. Gillaspie had falsified an expense report. Ms. Gillaspie acknowledged that she had done so. Fidelity terminated Ms. Gillaspie's employment for cause on June 13, 2008.

7. After Fidelity fired Ms. Gillaspie, Fidelity decided to audit some of the escrow accounts which Ms. Gillaspie had handled. Fidelity concluded that there were irregularities in two of the accounts.

8. <u>Machado/Pierson sale</u>. The first account concerned a sale of property by the Machado trust to Pierson Corp. for about $700,000. Ms. Gillaspie was the escrow officer responsible for the transaction. The sale closed on or about November 26, 2004.

9. At closing, a real estate agent named Joseph Pedeferri instructed escrow to retain $10,000 in escrow pending resolution of a "drainage issue" (ex. 53). Mr. Pedeferri stated that, according to the seller's representative, the work would be completed in a few days. For reasons which the evidence does not make clear, $11,000 (not $10,000) was held in escrow after the closing.

10. Mr. Pedeferri's letter did not describe the "drainage issue." On

3

December 14, 2004, a grant of easement and bill of sale was recorded by the Machado trust in favor of the Water Board of the County of Hawaii which creates an easement for a fire hydrant and its connection lines. (Ex. 57.) This easement was apparently the solution to the "drainage issue."

11. The retained funds remained in the escrow account until August 9, 2007, when a check in the amount of $11,000 was issued to Pueo, Ms. Gillaspie's company. Pueo eventually disbursed that amount plus accrued interest to Jack Pierson.

12. Ms. Gillaspie testified that the buyer was entitled to the held funds and that she received written instructions from the buyer to disburse the remaining funds to Pueo. I do not credit this testimony.

 a. First, Kent Pelt's testimony contradicted Ms. Gillaspie's. (Mr. Pelt is Fidelity's general counsel.) Mr. Pelt testified that the escrow file contained the original escrow instructions but contained no subsequent instruction to disburse the held funds to Pueo. I find Mr. Pelt's testimony on this point more credible than Ms. Gillaspie's.

 b. Second, Ms. Gillaspie's assumption that only the buyer was entitled to the funds, and therefore the buyer's unilateral instructions were sufficient, is incorrect. The funds were held to secure the seller's obligation to

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed 10/08/10   Page 4 of 25

resolve the "drainage problem." If the seller rectified the issue at its own expense, the seller should have received the held funds, because they were part of the purchase price for the property. According to Mr. Pedeferri's letter, the seller was in the process of solving the problem at the time of closing. Based on the recorded easement document, it appears that the seller rectified the problem. Therefore, the seller, not the buyer, was probably entitled to the money. At the very least, because if there was at least some doubt about which party was entitled to the money, escrow should have disbursed the money only on <u>joint</u> instructions from both the seller and the buyer.

c. Third, the testimony is illogical. Ms. Gillaspie does not explain why the buyer elected to have the funds distributed to Pueo rather than directly to the buyer.

13. Based on its review of the escrow file after Ms. Gillaspie's firing, Fidelity concluded that the seller, the Machado trust, was entitled to the held funds. Accordingly, Fidelity restored $11,000.00 to the escrow account and disbursed the money to the Machado trust. Although Fidelity's corporate parent made some of the cash transfers, all of the money was paid on behalf of Fidelity, and as a result of the intercompany accounts of the Fidelity family of companies, Fidelity, not the corporate parent, bore the loss.

5

14. <u>Wagco/PS sale</u>. The second questionable transaction was a sale of property by Wagco LLC to PS Investments, LLC, for $7,953,000.00. Ms. Gillaspie was the escrow officer.

15. When the sale closed on July 7, 2006, escrow disbursed $19,837.00 to the County of Hawaii to pay real property taxes on the subject property. About a year later, on August 21, 2007, the County refunded the same amount to escrow because the same taxes had already been paid.

16. The entitlement to the refunded money depended on who paid the taxes. If the seller paid them, the seller should have gotten the refund. If the buyer paid the taxes, the buyer was entitled to the money.

17. The money remained in escrow until early 2008. On February 5, 2008, escrow disbursed $9,000.00 to Pueo. On February 19, 2008, escrow disbursed $9,500.00 to Mr. Pedefferi. On April 7, 2008, escrow disbursed the remaining balance of the funds in the account, $1,337.00, to Mr. Pedefferi.

18. There are no written instructions in the escrow file authorizing the disbursements in early 2008. Ms. Gillaspie testified that Mr. Pedefferi instructed escrow to hold part of the commissions to which his brokerage firm, Century 21 All Islands, was entitled, and that the disbursements in early 2008 were made on his instructions. I do not credit this testimony.

6

a.    First, it is a highly unlikely coincidence that Mr. Pedefferi was entitled to exactly the same amount as the tax refund.

b.    Second, it is customary for real estate commissions to be split equally between the buyer's and seller's brokers. The two brokerage firms each collected the same amount, $159,060.00, at closing. It is highly unlikely that one brokerage firm was entitled to more than the other.

c.    Third, it is customary to pay all brokerage commissions in full at closing. Ms. Gillaspie offered no reason why a real estate broker would not want to collect the full commission at closing.

d.    Fourth, Ms. Gillaspie offered no reason why Mr. Pedefferi would have given Pueo any part of the commission.

e.    Fifth, it might have been illegal for Mr. Pedefferi to share a commission with Pueo unless Pueo had a real estate license. See Haw. Rev. Stat. §§ 467-14(5), (14).

19.    In 2007 or 2008, Fidelity's parent corporation issued a memorandum setting rules for the handling of held funds, meaning money held in escrow after a transaction closes. The parent issued the memorandum in order to correct sloppy procedures concerning such funds. The memorandum stated that escrow officers must establish specific agreements with the parties to the escrow about the

handling of held funds, and that in no event were held funds to remain in escrow for longer than ninety days. Neither the "sloppy escrow procedures" that the policy was intended to correct nor the policy itself justifies the diversion of funds from these two escrow accounts to improper purposes.

20. Ms. Gillaspie points out that each of the checks for the escrow disbursements described above was approved and signed in accordance with Fidelity's standard procedures. Ms. Gilaspie used her position as branch manager, escrow officer, and supervisor of the other escrow officers in Fidelity's Kona office to give these improper transactions a false patina of regularity, in order to conceal her misconduct.

21. After firing Ms. Gillaspie, Fidelity received claims from two lenders. Both lenders claimed that Ms. Gillaspie had borrowed money from them, had promised them first priority mortgages on the same piece of property, and had failed to record the mortgage. The lenders further claimed that Fidelity was responsible because Ms. Gillaspie used her position with Fidelity to induce them to trust her and arranged to close the loans through Fidelity's Kona office which she managed.

22. <u>Grunewald loan</u>. In the summer of 2007, Ms. Gillaspie borrowed money from two investors located by Grunewald Equity Funding, Inc.

8

("Grunewald").[2]  The loan amount was $140,000.00.  Fidelity was the escrow depository, and Shirlene Aseron, a Fidelity escrow officer in the Kona branch managed by Ms. Gillaspie, was the designated escrow officer.

23.     The loan was to be secured by a mortgage on property owned by Ms. Gillaspie ("Lot 23").  Ms. Gillaspie signed a mortgage, and her promissory note also recited that the loan was secured by a mortgage.  Grunewald and the lenders expected that the mortgage would be recorded at closing. Ms. Gillaspie told Grunewald that she would set up the recording of the mortgage.  Fidelity charged a $25.00 recording fee.

24.     Shortly after closing, Grunewald received from Fidelity a copy of the cover sheet of the mortgage with a certification by a Fidelity affiliate, Fidelity National Title Insurance Company, that the mortgage had been recorded on August 31, 2007, in the Hawaii Bureau of Conveyances as document number 2007-156355.  The stamp was falsified.  The mortgage in favor of the Grunewald lenders was not recorded in the Bureau of Conveyances.  (It could not have been recorded in the Bureau of Conveyances since Lot 23 is registered land covered by

---

[2]According to Grunewald's principal, Henry Heis, Ms. Gillaspie contacted Grunewald through a mortgage broker called "Joe with an Italian name, and I will have to find it because it's a very strange name."  It is likely that Ms. Gillaspie's mortgage broker was Joseph Pedefferi, who received  $10,837.00 from the Wagco/PS escrow account in the spring of 2008 and was also involved in the Machado/Pierson transaction.

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52  Filed  10/08/10   Page 9 of 25

the Land Court recording system.)  The recording information was taken from an entirely unrelated mortgage between different parties in a transaction where Ms. Gillaspie acted as escrow officer.  The stamp was photocopied from the unrelated mortgage and "cut and pasted" on to a copy of the cover sheet of Ms. Gillaspie's mortgage in favor of the Grunewald lenders.

25.     Ms. Gillaspie caused the nonrecording of the Grunewald mortgage and fraudulently concocted the false cover page.  As manager of the Kona branch, Ms. Aseron's supervisor, and escrow officer for the other loan transaction, Ms. Gillaspie had the opportunity and means to prevent the recording of the real mortgage and to fabricate the cover sheet suggesting that it had been recorded.  No one other than Ms. Gillaspie had a motive to prevent the recording of the mortgage and create a document falsely stating that the mortgage had been recorded.

26.     Ms. Gillaspie's motive was especially strong because, at about the same time, she was also borrowing money from another lender against the same property.  See the findings below concerning the Wong loan.

27.     In the mortgage, Ms. Gillaspie represented to the Grunewald lenders that no other mortgage encumbered Lot 23.  This was false.  The property was subject to a mortgage, dated January 26, 2005, securing a loan of $150,000 from American Savings Bank ("ASB").  The mortgagee was Mortgage Electronic

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed 10/08/10   Page 10 of 25

Registration Systems, Inc. ("MERS"), as nominee for ASB. The mortgage was duly recorded in the Land Court.

28.     On August 27, 2008, a release of the MERS/ASB mortgage was recorded in the Land Court. The release was purportedly signed by Alan Ono, a duly authorized representative of ASB and MERS. On September 11, 2008, MERS, as nominee for ASB, filed a petition in the Land Court alleging that the signature was forged. The Land Court granted the petition and expunged the release of the mortgage.

29.     It is more likely than not that Ms. Gillaspie forged the mortgage release. She was in financial difficulties at the time. Fidelity fired her about two months before the release was recorded, depriving her of a source of income. In the summer of 2008, she fell into default on the Grunewald loan; a check she wrote to Grunewald, dated August 29, 2008, was returned for insufficient funds. She also defaulted on the Wong loan (described below) at the same time. The release was in her financial interest at a time when she was under severe financial stress. No one else had a reason to forge the signature on the release document. As an experienced escrow officer, Ms. Gillaspie had the ability to create a convincing release document and to obtain samples of Mr. Ono's signature. The handwritten word "August" on the release is strikingly similar to Ms. Gillaspie's

11

handwriting.  See Ex. 16, 2021.

30.    After Ms. Gillaspie fell into default in her obligations to the
Grunewald lenders, Grunewald ordered a title report from another title company
and learned that its mortgage had not been recorded.  Grunewald also ordered a
copy of the document bearing the recording information on the fabricated face
page of Ms. Gillaspie's mortgage and found that that information pertained to a
different mortgage.

31.    On March 17, 2009, Grunewald and the Grunewald lenders made a
claim against Fidelity based on Fidelity's failure to record the mortgage.  Fidelity
investigated the matter, decided that the claim was proper, and paid $158,412.81
(the balance due under the Grunewald loan) to Grunewald and the lenders.  The
Grunewald lenders assigned their note and mortgage to Fidelity.

32.    Although an affiliate of Fidelity issued the check, Fidelity ultimately
paid the loss through its intercompany accounts with the affiliate.

33.    Wong loan.  On August 10, 2007, Ms. Gillaspie borrowed $55,000.00
from Peter Damien Wong.  Ms. Gillaspie agreed to grant a mortgage on Lot 23 in
favor of Mr. Wong.  Ex. 2036.

34.    Ms. Gillaspie failed to repay the loan when it became due on August
20, 2008.  Ms. Gillaspie then executed a mortgage, dated September 29, 2008,

12

which was recorded on January 9, 2009.  By that time, however, the MERS/ASB mortgage and the Grunewald mortgage encumbered Lot 23, so Mr. Wong's mortgage had third priority.  (Ex. 37.)[3]

35.     Mr. Wong made a claim against "Fidelity National Title" on June 23, 2009 (Ex. 35).  In his claim and subsequent correspondence, he alleged that he trusted Ms. Gillaspie because he had done business with Fidelity in Kona for some time but that Ms. Gillaspie defrauded him by representing that his mortgage had been recorded and had first priority.

36.     Fidelity conducted an investigation and concluded that Mr. Wong's claim had merit.  Fidelity's affiliate paid Mr. Wong $64,542.78, the full amount which Ms. Gillaspie owed Mr. Wong.

37.     Ms. Gillaspie testified that, under her agreement with Mr. Wong, the mortgage on Lot 23 was not supposed to be recorded until after the note became due.  I do not credit this testimony.

        a.     First, no sensible lender would agree to defer the perfection of its security position until more than a month after the debt was due and payable in full.  Based on his correspondence, Mr. Wong appears to be a sophisticated real

---

[3]Mr. Wong's statements in his correspondence with Fidelity are hearsay and were admitted in evidence solely to show that Fidelity received that correspondence.

13

estate investor who would not have accepted such an arrangement.

b. Second, the one page term sheet outlining the terms of the loan (ex. 35, 2036) says nothing about deferred recording of the mortgage. The clear implication of the term sheet is that the mortgage was supposed to have been recorded at the inception of the loan.

c. Third, the promissory note which Mr. Wong provided to Fidelity (Ex. 37) refers to a mortgage signed by Ms. Gillaspie and dated August 10, 2007, the same as the date of the note. Ms. Gillaspie offered in evidence a version of the note (Ex. 2021) which says that the mortgage is dated September 29, 2008, the same as the date of the mortgage that was eventually recorded. Ms. Gillaspie promised to deliver and record a mortgage concurrently with the closing of the loan transaction. She altered a copy of the note to change the date of the mortgage after Mr. Wong discovered that the mortgage was not recorded as she had promised.

Based on the foregoing findings of fact, the court makes the following

## CONCLUSIONS OF LAW:

1. The court has jurisdiction over this adversary proceeding, which is a core proceeding in bankruptcy. 28 U.S.C. § 157(b)(2)(I) (2006). Venue is proper.

2. Fidelity contends that its claims against Ms. Gillaspie are not

14

dischargeable under sections 523(a)(2) and (a)(4) of the Bankruptcy Code.

3.      Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor.  Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992); see also National Union Fire Insurance Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 300 (2d Cir. 1996); Meyer v. Rigdon, 36 F.3d 1375, 1385 (7th Cir. 1994).

4.      The plaintiff seeking to establish an exception to the discharge bears the burden of proof.  Fed. R. Bankr. P. 4005; see also In re Niles, 106 F.3d 1456, 1464-65 (9th Cir. 1997).  Plaintiff must meet this burden by a preponderance of the evidence.   Grogan v. Garner, 498 U.S. 279, 286 (1991); Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).

5.      A plaintiff can rely on inferences to carry its burden of proof.  In re Malget, 165 B.R. 933 (Bankr. S.D. Cal. 1994).  As fact finder, the judge is permitted to draw an inference from the admitted evidence, provided it is "drawn by reason from the facts on which it purports to rest."  Dreijer v. Girod Motor Company, 294 F.2d 549, 554 (5th Cir. 1961).

6.      Subrogation is defined as the "substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or

15

securities that would otherwise belong to the debtor." Black's Law Dictionary 1563-64 (9th ed. 2009).

> Among the oldest of these [equitable doctrines] is the rule of subrogation whereby one who has been compelled to pay a debt that ought to have been paid by another is entitled to exercise all remedies which the creditor possessed against the other.

American Surety Co. v. Bethlehem National Bank, 314 U.S. 314, 317, 62 S. Ct. 226, 228 (1941). Section 509 of the Bankruptcy Code codifies the equitable doctrine of subrogation in bankruptcy cases:

> [A]n entity that is liable with the debtor on, or has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

11 U.S.C. § 509(a) (2006). A subrogee can assert the creditor's right to nondischargeability under section 523(a)(4). See, e.g., In re Richardson, 178 B.R. 19, 23 (Bankr. D. Col. 1995) ("[The] intent [of Section 523] would be easily frustrated if the debtor in this case were simply able to avoid the liability by allowing the surety to cover the debt and then discharging the debt to the surety in bankruptcy."); In re Snellgrove, 15 B.R. 149 (Bankr. S.D. Fla.1981) (holding debtor's debt to plaintiff surety nondischargeable under § 523(a)(4) to the extent of the debtor's embezzlement); In re Covino, 12 B.R. 876, 876 (Bankr. M.D. Fla.1981).

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed 10/08/10   Page 16 of 25

7.    Fidelity is subrogated to the claims of the parties whose losses it paid as set forth above.  It does not matter that some of those parties did not assert claims directly against Ms. Gilaspie.  She is liable to those parties and cannot escape liability merely because those parties chose to pursue Fidelity, a solvent entity, in the first instance.

**I. Section 523(a)(2)**

8.    Section 523(a)(2)(A) of the Bankruptcy Code  provides:

> A discharge under . . . this title does not discharge an individual debtor from any debt -

> * * *

> (2)    for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by -

> (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

11 U.S.C. § 523(a) (2009); see also Cohen v. de la Cruz, 523 U.S. 213, 218-22 (1998).  To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate five elements:

> (1)    misrepresentation, fraudulent omission or deceptive conduct by the debtor;

> (2)    knowledge of the falsity or deceptiveness of his statement or conduct;

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed  10/08/10   Page 17 of 25

(3)    an intent to deceive;

(4)    justifiable reliance by the creditor on the debtor's statement or conduct; and

(5)    damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

In re Weinberg, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009); In re Slyman, 234 F.3d at 1085; Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996).

9.    Fidelity has established that Ms. Gillaspie committed fraud upon the Grunewald lenders within the meaning of section 523(a)(2).

a.    She falsely and fraudulently represented that there was no other mortgage on Lot 23 and that the mortgage in favor of the Grunewald lenders had been recorded. She created a phony document to convince them that the mortgage had been recorded and forged a release of the prior MERS/ASB mortgage.

b.    She knew that her statements were false and that the mortgage cover sheet she concocted was false.

c.    She intended to deceive the Grunewald lenders.

d.    Grunewald and the Grunewald lenders justifiably and reasonably relied on Ms. Gillaspie's statements, in part because Ms. Gillaspie was then an officer and branch manager of a reputable escrow company.

18

e.    The Grunewald lenders' reliance on Ms. Gillaspie's statements proximately caused them to suffer damage.  Because their mortgage was unrecorded, they had only an unsecured claim against Ms. Gillaspie which she did not pay.

10.    Although the circumstances of the Wong loan are highly suspicious and Ms. Gilaspie's testimony about the Wong mortgage is not credible, I am forced to conclude that Fidelity failed to offer sufficient admissible evidence of fraud in that transaction.  The evidence of Ms. Gillaspie's fraudulent intent came from correspondence which Mr. Wong sent to Fidelity in support of his claim. That evidence is hearsay and was received solely for the purpose of proving that Fidelity received the correspondence.   Mr. Wong was never deposed. Ms. Gillaspie attempted to take his deposition but he claimed to be unavailable, so Ms. Gillaspie's counsel agreed to forego his deposition if he signed a declaration. The declaration was received in evidence by stipulation (ex. 2037), but it does not contain sufficient facts to make Fidelity's case.[4]

## II. Section 523(a)(4)

11.    Section 523(a)(4) prevents discharge "for fraud or defalcation while

---

[4]This is hardly a surprise since Ms. Gillaspie's counsel drafted the declaration.  Ms. Gillaspie also served a trial subpoena on Mr. Wong.  He did not appear but neither party took steps to enforce the subpoena.

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed  10/08/10   Page 19 of 25

acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

**A. Embezzlement.**

12.    Federal law controls the definition of embezzlement for purposes of section 523(a)(4).  In re Wada, 210 B.R. 572, 576 (B.A.P.  9th Cir. 1997); Brown v. Felsen, 442 U.S. 127 (1979).  Embezzlement is "the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come."   Moore v. United States, 160 U.S. 268, 269 (1895). Embezzlement requires three elements: (1) property rightfully in the possession of a nonowner, (2) the nonowner's appropriation of the property to a use other than which it was entrusted, and (3) circumstances indicating fraud.  Transamerica Commercial Finance Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991); see also In re Snegosky, 2010 WL 2640598 (Bankr. D. Haw. 2010). Embezzlement does not require the existence of a fiduciary relationship.  Id.

13.    Ms. Gillaspie embezzled funds from the escrow accounts for the Machado/Pierson and Wagco/PS transactions.

        a.    The held funds were rightfully in the possession of Fidelity and Ms. Gillaspie, as Fidelity's corporate officer, branch manager, and escrow officer.

        b.    Ms. Gillaspie appropriated the funds for purposes other than that for which they were held.  The funds should have been disbursed to the

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed  10/08/10   Page 20 of 25

sellers, but instead were disbursed to Ms. Gillaspie's company, Pueo, Mr. Pedeferri, and the buyer.

   c. The circumstances reek of fraud. Ms. Gillaspie took that money in part for her own company, at a time when she was under severe financial stress, and in part for Mr. Pedeferri, an individual with whom she apparently had business dealings. Her attempt to justify her conduct is far from credible.

### B. Larceny.

14. The elements of larceny are the same as embezzlement except that the initial possession of the property was wrongful. Ormsby v. First Am. Title Co. (In re Ormsby), 591 F.3d 1199, 1205 (9th Cir. 2010).

15. Fidelity and Ms. Gillaspie were in lawful possession of the escrowed funds. Therefore, the first element of larceny is not satisfied.

### C. Fiduciary Defalcation.

16. "Defalcation" as used in § 523(a)(4) means a misappropriation of trust funds or money held in any fiduciary capacity, or the failure to account properly for such funds. In re Hemmeter, 242 F.3d 1186, 1190 (9th Cir. 2001); In re Lewis, 97 F.3d 1182 (9th Cir. 1996); In re Baird, 114 B.R. 198 (B.A.P. 9th Cir. 1990). "[T]he essence of defalcation in the context of § 524(a)(4) is a failure to produce funds entrusted to a fiduciary." Id. Intent to defraud is not required;

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed  10/08/10   Page 21 of 25

defalcation includes innocent as well as intentional failures.  Id.; see also F.D.I.C. v. Jackson, 133 F.3d 694 (9th Cir. 1998) ("[D]efalcation, at least for the purposes of nondischargeability under Section 523(a)(4), includes any behavior by a fiduciary, including innocent, negligent and intentional defaults of fiduciary duty . . . .")

17.    The disbursement of the escrowed funds in the Machado/Pierson and Wagco/PS transactions to the wrong people, without appropriate bilateral instructions, constitutes defalcation.

18.    The more difficult question is whether Ms. Gillaspie was acting in a "fiduciary capacity" under section 523(a)(4).

19.    Federal law defines the phrase "fiduciary capacity" as used in section 523(a)(4). Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996). Federal law narrowly construes the term "fiduciary" for purposes of section 523(a)(4).  Only relationships arising from express or technical trusts qualify as fiduciary relationships under section 523(a)(4).  Id.

> The meaning of 'fiduciary capacity' under section 523(a)(4) is a question of federal law, which has consistently limited this term to express or technical trust relationships. The broad general definition of a fiduciary relationship--one involving confidence, trust and good faith--is inapplicable in the dischargeability context. The debt alleged to be nondischargeable must arise from a breach of trust obligations imposed by law, separate and distinct from any breach of contract. In addition, the requisite trust relationship must

22

exist prior to and without reference to the act of wrongdoing. This requirement eliminates constructive, resulting or implied trusts.

In re Baird, 114 B.R. at 198. While the definition of "fiduciary capacity" under section 523(a)(4) is governed by federal law, courts must look to state law to determine whether the requisite trust relationship exists. In re Cantrell, 260 B.R. 413, 421 (B.A.P. 9th Cir. 2001); see also Ragsdale v. Haller (In re Haller), 780 F.2d 794, 795 (9th Cir. 1986).

20.     In this case, Fidelity contends that Haw. Rev. Stat. ch. 449, regulating escrow depositories, imposes a fiduciary relationship on Ms. Gillaspie. In some circumstances, a state statute can create a fiduciary capacity within the meaning of section 523(a)(4). In re Hemmeter, 242 F.3d at 1190. A statutory fiduciary is considered a fiduciary for purposes of section 523(a)(4) if the statute: (1) defines the trust res; (2) identifies the fiduciary's fund management duties; and (3) imposes obligations on the fiduciary prior to the alleged wrongdoing. Runnion v. Pedrazzini (In re Padrazzini), 644 F.2d 756, 758 (9th Cir. 1981).

21.     It is not clear that chapter 449 imposes a "fiduciary capacity" upon Ms. Gillaspie. Chapter 449 applies to "*all escrow depositories* and to any *other corporations* that, by violating any of the provisions of this chapter, shall be subject to the penalties and fines provided in this chapter." Haw. Rev. Stat. 449-1.5 (emphasis added). "Escrow depositories" are defined as "*the corporation*

23

which, in an escrow, and for compensation, receives, holds, and delivers the money, other consideration, or instrument affecting title to real property." Haw. Rev. Stat. § 449-1 (emphasis added). The chapter does not specify any duties or liabilities of the corporate officers, managers, or employees of an escrow depository.

22. Fidelity points out corporations act only through real people, and that a corporate escrow depository's fiduciary duties to its clientele must devolve upon the officers and employees who are employed to carry out those duties. Although this argument has much to commend it, it runs up against the well-established proposition that, even though corporate officers have fiduciary duties under state law, they are not acting in a "fiduciary capacity" within the narrow and specialized meaning of section 523(a)(4). In re Cantrell, 329 F.3d 1119 (9th Cir. 2003) ("[A]lthough officers and directors are imbued with the fiduciary duties of an agent and certain duties of a trustee, they are not trustees with respect to corporate assets"); see also Roots v. Bangerter (In re Bangerter), 106 B.R. 649, 654 (Bankr. C.D. Cal. 1989) (denying a 523(a)(4) cause of action because "California law does not hold that a majority shareholder is a trustee of the corporate assets or any interests that shareholders may have in the corporate res"); Alexander & Alexander of Washington, Inc. v. Hultquist (In re Hultquist), 101 B.R. 180 (B.A.P.

24

9th Cir. 1989) (holding that a corporate officer was not a fiduciary under 523(a)(4) because, under Washington law, "although the debtor may have owed a general fiduciary duty as a corporate officer under state case law, no pre-existing or statutorily created trust existed at the time of the alleged wrongdoing.") These cases are arguably distinguishable because, in this case, Ms. Gillaspie is accused of taking money that belonged, not to the corporation, but rather to third parties for which the corporation was undoubtedly a fiduciary.

23.    I need not resolve these questions, however, because I have already concluded that Ms. Gillaspie's conduct concerning the held funds amounted to embezzlement under section 523(a)(4).

Fidelity's counsel is directed to submit a final judgment in accordance with this decision.

/s/ Robert J. Faris
United States Bankruptcy Judge
Dated: 10/08/2010

U.S. Bankruptcy Court - Hawaii   #09-90062   Dkt # 52   Filed  10/08/10   Page 25 of 25